## IN THE UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | |
|---|---|
| MICHELLE RENEE ILEY, | CASE NO. 1:25-CV-01381-BYP |
| Plaintiff, | |
| vs. | DISTRICT JUDGE BENITA Y. PEARSON |
| COMMISSIONER OF SOCIAL SECURITY, | MAGISTRATE JUDGE AMANDA M. KNAPP |
| Defendant. | **REPORT AND RECOMMENDATION** |

Plaintiff Michelle Renee Iley seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI").  (ECF Doc. 1.)  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation pursuant to Local Rule 72.2.

For the reasons set forth below, the undersigned recommends that the final decision of the Commissioner be **AFFIRMED**.

### I.      Procedural History

On July 22, 2020, Ms. Iley filed applications for DIB and SSI, alleging disability beginning July 14, 2016.  (Tr. 172.)  These applications were denied initially and upon reconsideration (*id.*), and Ms. Iley requested a hearing (*id.*).  On October 12, 2021, an Administrative Law Judge ("ALJ") issued a decision finding that Ms. Iley had not been under a disability from July 20, 2022, through the date of the decision.  (Tr. 189.)  Ms. Iley requested review of this decision by the Appeals Council, which denied her request for review.  (Tr. 194.)

1

Ms. Iley filed the instant DIB and SSI applications on October 6, 2022, alleging disability beginning July 5, 2017.  (Tr. 200, 219.)  She later amended the alleged onset date to October 13, 2021.  (Tr. 119.)  She alleged disability due to vision issues, fibromyalgia, obesity, asthma, carpal tunnel syndrome, degenerative disc disease entire back, osteoarthritis right ankle, migraines, neurocognitive disorder, and bipolar disorder.  (Tr. 201, 210.)  Her applications were denied at the initial level (Tr. 200, 219) and upon reconsideration (Tr. 230-31).  She then requested a hearing.  (Tr. 285.)

On February 14, 2024, a hearing was held before an ALJ.  (Tr. 115-46.)  The ALJ issued an unfavorable decision on March 26, 2024, finding Ms. Iley had not been under a disability from October 13, 2021, through the date of the decision.  (Tr. 7-31.)  Ms. Iley requested review of the decision by the Appeals Council, and her request for review was denied on May 8, 2025, making the ALJ's decision the final decision of the Commissioner.  (Tr. 1-6.)

Ms. Iley filed the instant Complaint on July 1, 2025 (ECF Doc. 1), and the matter is fully briefed (ECF Docs. 9, 12, 13).  She raises the following legal issues within a single assignment of error: (1) The ALJ's Residual Functional Capacity ("RFC") finding is unsupported by substantial evidence (ECF Doc. 9, pp. 18-26); (2) the ALJ erred when failing to evaluate Plaintiff's allegations pursuant to SSR 16-3p (*id.* at pp. 26-33); (3) the ALJ erred when failing to identify evidence of improvement (*id.* at pp. 18-26, 30-33); and (4) the ALJ improperly relied upon an insufficient record and failed to obtain a new medical opinion (*id.* at pp. 34-35).

## II.    Evidence

### A.    Personal, Educational, and Vocational Evidence

Ms. Iley was born in 1977 and was 43 years old on the amended alleged disability onset date, making her a younger individual under Social Security regulations on the alleged onset

date.  (Tr. 119, 201, 210.)  She completed tenth grade.  (Tr. 392.)  She has not worked since July

15, 2017, the original alleged onset date.  (Tr. 201, 210.)

## B.       Medical Evidence

### 1.       Relevant Treatment History[1]

On September 17, 2021, Ms. Iley underwent a right knee arthroscopy.  (Tr. 1017.)  On

October 7, 2021, a nerve conduction velocity (NCV) study and an electromyography (EMG) study

were normal for the right upper and lower extremities.  (Tr. 2521.)

On October 13, 2021, Ms. Iley presented to James A. Goudy II, M.D., at Avita Health

Internal Med and Gastro Galion, complaining of abdominal pain and diarrhea.  (Tr. 1015-19.)  She

also reported fatigue, palpitations, dizziness, and weakness, but did not report back pain, joint

swelling, chest pain, light-headedness, or headaches.  (Tr. 1016.)  On examination, she had normal

vision and range of motion in the neck, with no abnormalities in the extremities.  (Tr. 1018.)

On October 19, 2021, Ms. Iley presented for evaluation and treatment of her neck and back

pain with Erica L. Clinker, APRN-CNP, at Avita Ontario Pain Clinic.  (Tr. 1011-15.)  She reported

shooting pain in her neck and back rated at 7/10 with numbness and tingling in her hands and feet

and weakness in both legs.  (Tr. 1011.)  A physical examination showed normal range of motion in

the back, no tenderness and negative axial loading for the lumbar facets bilaterally, right lumbar

paravertebral and right gluteal spams with trigger points, negative Faber's, 5/5 strength, and intact

reflexes in all extremities.  (Tr. 1013.)  Ms. Iley ambulated without assistance but had an antalgic

gait.  (*Id.*)  APRN Clinker refilled prescriptions for Norco and Flexeril and prescribed a trial of

Cymbalta for pain and a tearful/anxious mood.  (Tr. 1014.)  At a follow-up on November 16, 2021,

---

[1] The summary of the medical evidence is not exhaustive and is generally limited to evidence cited by the parties that is from the alleged disability period and relevant to the legal and factual issues before the Court.

Ms. Iley reported improved pain levels that increased when standing, walking, and using the stairs. (Tr. 997.)  A physical examination was unchanged from the previous visit.  (Tr. 1000.)

On October 20, 2021, Ms. Iley attended an appointment with Brittani Atwood, APRN-CNP, at AVI ONT Neurology.  (Tr. 707-11.)  She reported numbness, tingling, and burning in her hands, feet, arms, and legs.  (Tr. 708.)  Lyrica decreased the symptoms' intensity.  (Tr. 707.)  Ms. Iley denied falls, injuries, or focal weakness and said she was independent in activities of daily living ("ADLs").  (*Id.*)  On examination, her cranial nerves and coordination were normal, she had decreased sensation to pinprick in the left leg and right hand, and she displayed 5/5 strength bilaterally in shoulder abduction, 3/5 strength in right hip flexion, and 4/5 strength throughout the rest of the upper and lower extremities.  (Tr. 710-11.)  APRN Atwood increased Ms. Iley's dose of Lyrica from 50 to 75mg and continued Cymbalta as prescribed by pain management.  (Tr. 707.)

Ms. Iley underwent a left knee arthroscopy on November 19, 2021.  (Tr. 534-36.)  She attended physical therapy for her left knee one to three times a week throughout January, February, and March 2022.  (*See* Tr. 901-12, 923-25, 929-32, 936-38, 940-53, 961-63, 982-86.)

On January 11, 2022, Ms. Iley attended a telehealth appointment with Courtenay K. Moore, M.D., of OSU Ambulatory Urology to address incontinence and rectocele.  (Tr. 973-77.)  She reported symptoms of worsening urge urinary incontinence, constipation, and diarrhea.  (Tr. 974.)  Dr. Moore referred her for Botox injections to treat incontinence and overactive bladder.  (Tr. 977.)  Ms. Iley underwent a cystoscopy and Botox injection for urge incontinence on February 8, 2022.  (Tr. 939-40, 1685-87.)

On January 14, 2022, at a pain management follow-up with APRN Clinker, Ms. Iley reported aching, sharp pain of 5/10 in the low back, right hip, neck, and bilateral shoulders, and numbness, tingling, and weakness in the bilateral hands, legs, and feet.  (Tr. 968.)  On physical examination, she

displayed: guarded range of motion with moderate pain on flexion, extension, and rotation of the back; tenderness with extension, compression, and direct palpation along the lumbar facets bilaterally; negative Faber's; no spasms or trigger points; lumbar pain radiating to the bilateral lower extremities; antalgic but steady gait; intact reflexes; and no motor weakness in the bilateral upper and lower extremities.  (Tr. 971.)  APRN Clinker recommended lumbar epidural steroid injections and refilled prescriptions for hydrocodone, cyclobenzaprine, Cymbalta, and naloxone.  (Tr. 972.)

On January 20, 2022, Ms. Iley presented to APRN Atwood for a neurology follow-up. (Tr. 702-06.)  She reported constant numbness, tingling, and burning in her hands and feet, and low back pain that radiated down her legs.  (Tr. 703.)  She said she was independent in all ADLs. (Tr. 702-03.)  On physical examination, she displayed normal movement and coordination, decreased sensation in the left leg and right hand, 5/5 muscle strength bilaterally in shoulder abduction, 3/5 strength in right hip flexion, and 4/5 strength throughout the rest of the upper and lower extremities.  (Tr. 705-06.)  APRN Atwood increased Ms. Iley's dose of Lyrica from 75 to 100mg and set a follow-up in six months.  (Tr 702.)

On January 21, 2022, Ms. Iley attended an appointment with David G. Stainbrook Jr., DO, at Ativa Health Rheumatology.  (Tr. 954-57.)  She reported no energy, weakness and paresthesia of the hands and feet, and constant, aching joint, back, leg, knee, muscle, and neck pain.  (Tr. 954.)  She had taken Humira in the past and recently completed Prednisone but wanted a different medication.  (*Id.*)  A physical examination showed: tenderness of the thoracic back, lumbar back, and bilateral shoulders, upper arms, and knees; decreased strength in the bilateral hands; decreased range of motion in the shoulders, cervical back, lumbar back, bilateral knees, and bilateral ankles; crepitus in the left knee and right wrist; sensory deficit and weakness; positive Tinel's in both wrists with decreased grip strength; and paresthesia in the right lateral thigh.  (Tr. 955-56.)  Dr. Stainbrook recommended stretching and aerobic exercise as "the

5

cornerstone" of fibromyalgia treatment.  (Tr. 956.)  He stopped Sulindac, prescribed Sulfasalazine, 500mg once a day, and set a follow-up in two months.  (Tr. 957.)  At follow-up appointments with Dr. Stainbrook in 2022, Ms. Iley continued to report pain in her joints, back, muscles, right hip, left knee, and neck, paresthesia of the hands and feet, weakness, and low energy.  (Tr. 892 (4/6/2022), 757 (9/15/2022).)  Her physical examination findings remained largely unchanged.  (Tr. 893-94, 758-59.)  Treatment primarily consisted of medication adjustments, particularly stopping and starting Humira around surgeries.  (Tr. 895, 760.)

On February 24, 2022, Ms. Iley presented at the Ativa Hospital ER after falling while running on a treadmill.  (Tr. 925.)  She had some bruises on her arms and legs, but she did not lose consciousness, had no head trauma, and walked without difficulty.  (Tr. 928.)  After an otherwise normal physical examination, she was discharged with instructions to take over-the-counter pain medications and apply ice as needed.  (*Id.*)

Ms. Iley underwent an epidural steroid injection at L5-S1 on February 28, 2022.  (Tr. 918.)  At a pain management appointment in April, she reported that the epidural injection had provided minimal relief.  (Tr. 896.)

On March 30, 2022, Ms. Iley presented at the Mansfield Hospital ER with severe knee pain.  (Tr. 543-44.)  On examination, she had a small joint effusion in the left knee with tenderness along the lateral aspect on flexion to 90 degrees and extension to 180 degrees.  (Tr. 547.)  She had otherwise normal range of motion, normal coordination, no weakness, and no tenderness or deformity.  (*Id.*)  An x-ray showed no evidence of acute fracture or malalignment.  (*Id.*)  Ms. Iley was given Percocet at the hospital and discharged with instructions to take over-the-counter anti-inflammatories at home and follow up with her orthopedic doctor.  (Tr. 547-48.)

On April 4, 2022, Ms. Iley attended a pain management appointment with APRN Clinker.  (Tr. 896-99.)  She reported aching low back pain of 5/10 and numbness, tingling, and weakness in

her legs.  (Tr. 896.)  A physical examination showed: guarded range of motion with pain on flexion, extension, and rotation of the back; tenderness with extension, compression, and direct palpation along the lumbar facets bilaterally; positive axial loading to the lumbar facets on the right; no spasms or trigger points; positive Faber's compression test, sacral thrust, and distraction test on the right; lumbar pain that did not radiate; antalgic but steady gait; intact reflexes; and no motor weakness in the extremities.  (Tr. 898.)  APRN Clinker continued cyclobenzaprine, duloxetine, and hydrocodone and recommend a right sacroiliac ("SI") joint injection for sacroiliitis.  (Tr. 899.)

On April 24, 2022, Ms. Iley presented to the Mansfield Hospital ER after falling out of bed and landing on her right arm and abdomen.  (Tr. 552.)  On examination, there was no bruising or swelling of her abdomen, an x-ray showed no acute fracture of her arm, and her vitals were stable.  (Tr. 554; *see also* Tr. 557 (showing some tenderness and decreased range of motion in the right shoulder and arm with otherwise normal findings).)  Ms. Iley was discharged with a sling and instructions to follow up with her primary care physician.  (Tr. 554.)

On May 2, 2022, Ms. Iley presented to Lisa M. Ward, PA-C, in endocrinology at the Ohio State University Comprehensive Cancer Center ("The James").  (Tr. 889-91.)  She had been referred due to recent growth of a right adrenal nodule that had been stable for years.  (Tr. 890.)  She reported dizziness, occasional sweating spells, trouble sleeping, and chronic fatigue.  (*Id.*)  A physical exam was normal.  (*Id.*)  Ms. Iley agreed to have the nodule surgically removed and was referred for evaluation and scheduling surgery.  (Tr. 891.)

On May 5, 2022, Ms. Iley underwent a CT scan of the left knee that revealed left knee osteoarthritis with small-to-moderate joint effusion.  (Tr. 597-98.)

On May 9, 2022, at PA-C Ward's referral, Ms. Iley saw Priya H. Dedhia, M.D., Ph.D., at the James.  (Tr. 887-89.)  She reported numerous adrenal symptoms and agreed to proceed with a robotic right possible open adrenalectomy.  (Tr. 889.)

7

On May 12, 2022, Ms. Iley attended a pre-operative consultation with Matthew Cole Bernhard, M.D. at Mansfield Hospital Surgery Orthopedics.  (Tr. 620.)  Dr. Bernhard noted that Ms. Iley's left knee degenerative arthrosis had not improved after six months of conservative treatment and a left knee arthropathy.  (*Id.*)  He performed a total left knee replacement on May 23, 2022.  (Tr. 635-36.)  Ms. Iley was discharged that same day, with instructions to follow up in two weeks (Tr. 631) and plans for physical and occupational therapy (Tr. 622-30).

On May 28, 2022, Ms. Iley went to the Mansfield Hospital ER following a fall and sudden onset left knee pain the previous night.  (Tr. 654-68.)  On examination, range of motion in her left knee was somewhat limited due to swelling and discomfort, but the extremity was neurovascularly intact.  (Tr. 658.)  Ms. Iley received a morphine 4 mg IV push.  (Tr. 659.)  X-rays of the left knee revealed no acute osseous abnormality of the left knee, no periprosthetic fracture or dislocation, small joint effusion, and soft tissue edema.  (Tr. 666-67.)  In addition to her knee pain, Ms. Iley reported left calf pain for the past three days.  (Tr. 660.)  As no venous ultrasound to check for a blood clot was immediately available, she was discharged with an anticoagulant to take until an ultrasound could be scheduled.  (Tr. 660-62.)

Ms. Iley attended physical therapy a few times a week between June 13 and July 13, 2022.  (Tr. 848-62, 868-79.)  As of her last visit, her range of motion in the left knee was still decreased, but her knee and hip strength was 4/5 on the left and 5/5 on the right.  (Tr. 849.)

On June 23, 2022, Ms. Iley attended a pain management appointment with Arjun Sharma, M.D., at Avita Ontario Pain Clinic.  (Tr. 863-66.)  She reported aching and throbbing left knee pain of 5/10 with weakness.  (Tr. 863.)  On physical examination, her deep tendon reflexes and sensation in the upper and lower extremities were grossly intact, her gait was normal, she had moderate edema and enlarged diameter in the left knee, her left knee alignment was abnormal, there was no crepitus with flexion/extension of the left knee, and she experienced moderate increased pain with palpation

in the left knee.  (Tr. 864-65.)  Dr. Sharma increased her dose of Norco for pain to assist with post-operation physical therapy.  (Tr. 865.)  He refilled duloxetine, Flexeril, Lyrica, and naloxone.  (*Id.*)

On July 20, 2022, Ms. Iley attended a neurology follow-up with APRN Atwood.  (Tr. 697-701.)  Ms. Iley reported that her symptoms of paresthesia and numbness were well-controlled on her current dose of Lyrica, and she was tolerating her medication well.  (Tr. 698.)  Her physical examination continued to show normal systems throughout except for mild to moderate decreased strength in the upper and lower extremities.  (Tr. 700-01.)  APRN Atwood no longer noted decreased sensation in the left leg and right hand, as was noted in previous appointments.  (Tr. 701; *see* Tr. 706, 711.)  She continued Lyrica 100 mg.  (Tr. 697.)

On August 6, 2022, Ms. Iley underwent a robotic adrenalectomy performed by Dr. Dedhia.  (Tr. 821-38.)  On August 18, 2022, she went to the University Hospital ER with abdominal pain, and imaging showed an abscess at the incision site.  (Tr. 789-815.)  A physical examination was unremarkable, and she was admitted for evaluation and management.  (Tr. 793.)  A drain was placed in right anterior abdominal wall for fluid collection on August 19.  (Tr. 804.)  Ms. Iley tolerated the procedure well, and when she was discharged on August 20, she was hemodynamically stable, afebrile, voiding spontaneously, tolerating adequate oral intake, ambulating without difficulty, and controlling pain with medication.  (Tr. 806.)  The drain was removed on August 26, and Ms. Iley denied pain after removal.  (Tr. 781-83.)

At a pain management appointment with Dr. Sharma on September 29, 2022, Ms. Iley endorsed aching, stabbing neck, shoulder, and low back pain of 5/10 with numbness/tinging in the neck, bilateral hands, and feet.  (Tr. 749.)  Her pain increased with turning her head and standing, and she reported weakness in her bilateral hands and legs.  (*Id.*)  Her examination revealed symmetrical deep tendon reflexes and intact sensory throughout, normal gait, 4/5 strength in the bilateral upper extremities, loss of lordotic curve in the cervical spine with moderately limited extension, lateral

9

bending, and rotation, tenderness to palpation over the bilateral C3-4, C-45 facets, negative Spurling's test, positive cervical facet loading bilaterally, and trigger points in the cervical paraspinal, trapezius, and levator scapulae muscles.  (Tr. 751.)  Dr. Sharma noted generalized weakness since the recent adrenalectomy, referred Ms. Iley to PT for whole body reconditioning, and refilled Norco, duloxetine, Flexeril, naloxone, and Lyrica.  (*Id.*)

On October 1, 2022, Ms. Iley went to the Ativa ER after rolling her right ankle while walking in slide-type sandals.  (Tr. 743-44.)  She felt pain with range of motion but no numbness or tingling.  (Tr. 744.)  A physical examination was otherwise normal.  (Tr. 747.)  X-rays showed lateral soft tissue swelling and no evidence of acute osseous abnormality.  (Tr. 1518.)  Ms. Iley was diagnosed with ankle sprain, given an Ace wrap and told to take anti-inflammatories and apply rest, ice, compression and elevation.  (Tr. 748.)  She followed up on the sprain with Samantha E. Bark, DPM, on October 7, 2022.  (Tr. 742-43.)  Dr. Bark told Ms. Iley she had signs of a syndesmotic injury that could lead to surgery.  (Tr. 742.)  She ordered an MRI and prescribed a CAM boot.  (*Id.*)

On October 12, 18, and 21, 2022, Ms. Iley underwent physical therapy at Avita Bucyrus Physical Therapy for neck pain relating to cervical spondylosis, sacroiliitis, chronic pain syndrome, and myofascial pain.  (Tr. 731-40, dup. at Tr. 3259-69.)  Her insurance would not approve more visits.  (Tr. 733.)  By the October 21 appointment, Ms. Iley continued to report some stiffness and 4/10 pain but range of motion in the neck had improved.  (Tr. 732-33.)

On November 1, 2022, Ms. Iley followed up with DPM Bark after an ankle MRI.  (Tr. 3254.)  The MRI showed injury to ankle ligaments and fracture of the lateral process of the talus. (*Id.*; *see* Tr. 3257-58.)  Ms. Iley was not always wearing her CAM boot, so DPM Bark gave her a short fiberglass cast.  (Tr. 3254-55.)  At a follow-up on December 6, 2022, Ms. Iley said her boyfriend cut off her cast after three weeks due to the smell.  (Tr. 3909.)  She reported 3/10 pain

10

with activity, and no pain with resting.  (*Id.*)  Examination of the right lower extremity showed no tenderness to palpation, no crepitus or significant weakness, no erythema, edema, or ecchymosis, and the ankle was stable with some pain in the lateral gutter of the ankle.  (Tr. 3910.)  X-rays taken that day showed notable signs of healing of the talus fracture.  (*Id.*)  DPM Bark ordered staying in the CAM walker boot for two more weeks and physical therapy.  (*Id.*)

On November 11, 2022, Ms. Iley presented to Virenkumar Patel, M.D., at Ohio Health Physician Cardiology Clinic.  (Tr. 3690-95.)  She complained of increasingly frequent heart palpitations over the previous three months.  (Tr. 3691.)  A physical examination showed normal pulmonary effort and breath sound, normal heart rate and rhythm, and normal range of motion in the neck and throughout.  (Tr. 3694-95.)  Dr. Virenkumar noted a normal ECG from April 30, 2022.  (Tr. 3695.)  He ordered a Holter monitor and ordered a new ECG.  (Tr. 3691; *see* Tr. 3697-99.)  Ms. Iley wore the Holter Monitor from November 11 to 21, 2022.  (Tr. 3732.)  Dr. Virenkumar reviewed it in early February 2023, and it showed no significant arrhythmias, rare PVSCS, and patient triggered events that corresponded with sinus tachycardia and sinus rhythm.  (Tr. 3746.)  He instructed Ms. Iley to continue her medication regimen.  (*Id.*)  An ECG performed on January 31, 2023, was normal.  (Tr. 3734-41.).

Ms. Iley returned to see Dr. Sharma on November 15, 2022.  (Tr. 3912-17.)  She endorsed aching, burning pain of 6/10 in the low back and both shoulders that was relieved by pain medication and a heating pad.  (Tr. 3912.)  She also reported weakness in both hands and numbness/tingling in both hands and feet.  (*Id.*)  Her physical examination was unchanged from the previous appointment.  (Tr. 3913-14.)  Dr. Sharma continued Norco, Duloxetine, Flexeril, and Lyrica and scheduled two bilateral C3-4, C4-5 facet blocks to be followed by radiofrequency ablation ("RFA").  (*Id.*)  He also referred Ms. Iley to neurology for right-sided weakness and whole-body deconditioning.  (Tr. 3915.)

11

Throughout 2022, Ms. Iley saw Dr. Goudy at Avita Internal Medicine and Gastro to follow-up on her diabetes.  (Tr. 773-77 (8/30/2022), 882-86 (5/18/2022), 932-36 (2/18/2022), 978-82 (1/7/2022), 3305-11 (9/8/2022), 3888-92 (12/30/2022).)  At these appointments, she reported intermittent symptoms of abdominal pain, nausea, diarrhea, constipation, headaches, dizziness, lightheadedness, and weakness (Tr. 978, 932, 882, 773, 3305); on at least one occasion she attributed diarrhea to medication prescribed to treat a different condition (Tr. 774).  Physical examinations were consistency unremarkable, including normal range of motion in the neck. (Tr. 981, 935, 885, 776, 3310-11, 3891-92.)  As of August 30, 2022, Dr. Goudy noted that Ms. Iley's diabetes was well controlled with medication.  (Tr. 777.)

On January 4, 2023, Ms. Iley attended an initial physical therapy evaluation for her right ankle with Gerald Beck, PT.  (Tr. 3882-88.)  On examination, she had reduced range of motion and full strength in the ankle, she walked with antalgic gait, and she needed assistance to stand from sitting.  (Tr. 3883-84.)  She did not return to physical therapy and was discharged on May 31, 2023.  (Tr. 3886-87.)

On January 10, 2023 (Tr. 3876-78) and January 24, 2023 (Tr. 3865-67), Dr. Sharma administered bilateral C3-4 and C4-5 facet joint blocks to treat cervical spondylosis without myelopathy.  At a follow up on February 2, 2023, Ms. Iley reported "significant relief over 80%" from the facet joint blocks, with increased range of motion and decreased pain with provocative maneuvers and increased ability to perform ADLs.  (Tr. 3858.)

Mr. Iley attended a rheumatology follow-up with Dr. Stainbrook on February 1, 2023. (Tr. 3860-63.)  She complained of poor energy levels, migraines, paresthesia of the hands and feet, weakness in the hands, feet, neck, and shoulders, and "horrible" joint, back, muscle, and neck pain.  (Tr. 3860.)  She had been on and off Humira due to multiple recent surgeries and did not know if it was working.  (*Id.*)  On physical examination, she displayed: tenderness of the

12

thoracic back, lumbar back, and bilateral shoulders, upper arms, and knees; decreased strength in the bilateral hands; decreased range of motion in the shoulders, cervical back, lumbar back, bilateral knees, and bilateral ankles; crepitus in the right knee and right wrist; sensory deficit and weakness; positive Tinel's in both wrists with decreased grip strength; and paresthesia in the right lateral thigh.  (Tr. 3861-62.)  Dr. Stainbrook increased a prescription for Sulfasalazine, encouraged home exercises, and prescribed diclofenac and Humira.  (Tr. 3863.)  At follow-up appointments in 2023, Ms. Iley's reported symptoms and physical examination findings remained unchanged, except that she did not report migraines in June 2023.  (Tr. 3789-93 (6/14/2023), 4994-5004 (10/30/2023).)  Dr. Stainbrook did not adjust medications in June 2023 (Tr. 3793), but he increased a prescription for Sulfasalazine in October, and, at Ms. Iley's request, referred her to Ohio State University Rheumatology.  (Tr. 5003; *see* 5014-16.)

On February 6, 2023, Ms. Iley presented to Deana Kay Faneilo, CNP, at OhioHealth Orthopedics and Sports Medicine for treatment of bilateral knee pain.  (Tr. 3658-77.)  She said that her left knee was sore and popped and clicked since her left knee surgery.  (Tr. 3658.)  CNP Faneilo informed her this was normal for up to a year post-surgery and recommended continuing exercises at home.  (*Id.*)  Ms. Iley also reported trouble using stairs and inability to fully bend or straighten the right leg.  (*Id.*)  The knee had also given out or felt unstable, and she had fallen several times on both knees.  (*Id.*)  Her examination revealed normal cervical range of motion, normal reflexes, and musculoskeletal swelling and tenderness.  (Tr 3664.)  X-rays of the right knee showed tricompartmental osteophytes and minimal joint effusion.  (*Id.*)  CNP Faneilo assessed chondromalacia patellae of right knee and patellofemoral pain syndrome of the right knee.  (*Id.*)  She fit Ms. Iley for a knee brace and recommended an MRI.  (*Id.*)

13

On March 2, 2023, Ms. Iley saw APRN Atwood for a neurology follow-up.  (Tr. 3843-47.)  She reported that the numbness, burning, and tingling sensation in her extremities had worsened since her last appointment, but she was still independent in all ADLs.  (Tr. 3844.)  APRN Atwood increased Lyrica from 100 to 150mg.  (*Id.*)  A physical examination was normal except for mild to moderate decreased strength in the extremities.  (Tr. 3846-47.)

On March 6, 2023, Dr. Sharma performed a conventional RFA of the right C3-4, C4-5 facet joints.  (Tr. 3838-42.)  At a follow-up on April 6, 2023, Ms. Iley reported minimal relief from the RFA.  (Tr. 3827.)  She reported aching, 4/10 pain in the neck, low back, and bilateral knees that increased with standing, walking, and rising after sitting but was relieved by relaxation, pain medication, and a heating pad.  (*Id.*)  A physical examination showed normal deep tendon reflexes, intact sensory testing, 4/5 motor in bilateral upper extremities, loss of lordotic curve in the cervical spine with moderately limited range of motion, tenderness to palpation over the bilateral C3-4 and C4-5 facets, positive cervical facet loading bilaterally, negative Spurling's, and trigger points in the cervical paraspinal, trapezius, and levator scapulae muscles.  (Tr. 3829.)  Dr. Sharma continued Norco, duloxetine, Flexeril, and Lyrica.  (*Id.*)  He performed a second RFA of the left C3-4 and C4-5 facet joints on May 9, 2023.  (Tr. 3810-12.)

Ms. Iley attended a cardiology follow-up on April 18, 2023.  (Tr. 3747- 52.)  She reported no palpitations during the day when she was active (Tr. 3749), and her physical examination was normal (Tr. 3752).  Dr. Virenkumar adjusted her medications and set a follow-up for one year.  (*Id.*)

On May 5, 2023, Ms. Iley presented at the Avita Ontario ER complaining of right foot, knee, hip, and shoulder pain after falling two nights before when her leg "gave out."  (Tr. 3815.)  She denied numbness, dizziness, or weakness, and she could bear weight and walk without too much difficulty.  (Tr. 3815-16.)  She had already seen her primary care provider and been evaluated.  (Tr. 3815.)  Her physical examination revealed tenderness was present, but there was no swelling or

14

deformity, no focal deficit, and no other abnormalities.  (Tr. 3819.)  X-rays revealed no fracture, and Ms. Iley was discharged to follow-up with her primary care provider.  (Tr. 3821.)

On May 22, 2023, at Dr. Goudy's referral, Ms. Iley saw David S. Fitch, D.O., at Avita Spine & Physical Medicine and Rehabilitation for low back pain.  (Tr. 3806-09.)  She endorsed right SI joint pain, legs giving way, and worsening bilateral lower extremity paresthesia and pain over the previous year.  (Tr. 3806.)  A physical examination showed 2-3+ reflexes in the bilateral lower extremities, full strength in the knees, decreased sensation of the right anterolateral thigh and foot, positive Spurling's sign bilaterally, and positive SI joint provocative test on the right.  (Tr. 3806-07.)  Dr. Fitch ordered an MRI of the lumbar spine.  (Tr. 3806.)

On June 8, 2023, Mr. Iley followed up with Dr. Sharma.  (Tr. 3800-05.)  She reported weakness in both hands, numbness/tinging in both hands and feet, and 8/10 pain in the neck, low back, and bilateral knees that increased with standing, walking, and sitting.  (Tr. 3800.)  She denied relief from the recent RFA.  (*Id.*)  A physical examination remained unchanged from the previous appointment.  (Tr. 3802.)  Dr. Sharma ordered a cervical spine MRI due to subjective numbness in both hands and ongoing neck pain for over six months.  (Tr. 3803.)  He continued Norco, duloxetine, Flexeril, and Lyrica.  (*Id.*)

On June 14, 2023, Ms. Iley went to the Avita Ontario ER after repeatedly falling four days prior and landing on the bathtub.  (Tr. 3794.)  She complained of severe pain in the right ribs and upper abdomen and chronic weakness in the legs.  (*Id.*)  Her examination noted tenderness in the right upper quadrant of the abdomen and over the right lower ribs anteriorly, but no other abnormalities.  (Tr. 3798.)  A CT scan of the chest, abdomen, and pelvis showed rib fractures on the right.  (Tr. 3799.)  Ms. Iley was discharged with a three-day prescription for Tramadol 50mg.  (Tr. 3800.)

15

On June 18, 2023, Ms. Iley went to the Mansfield Hospital ER complaining of left foot swelling that was not painful. (Tr. 4648.) She reported having fallen the day before, but she did not believe this injured her foot. (*Id.*) Her examination revealed normal range of motion throughout and diffuse swelling to the top of the left foot and lateral left ankle with no pitting, erythema, or warmth. (Tr. 4651.) The foot was neurovascularly intact (*id.*), and an x-ray showed no acute fractures, plantar calcaneal spur, normal joint spacing, diffuse soft tissue prominence, and a punctate corticated ossific density along the lateral aspect of the third middle phalanx joint, likely sequela of prior injury (Tr. 4653). Ms. Iley was discharged with instructions to take anti-inflammatories at home and follow up with primary care. (*Id.*)

On June 19, 2023, an MRI of the cervical spine showed loss of normal cervical lordosis suggesting underlying muscular spasm but did not show acute findings, spinal stenosis, or foraminal encroachment. (Tr. 3958-60.) An MRI of the lumbar spine the next day showed no significant degenerative changes, spinal stenosis, or foraminal narrowing. (Tr. 3956-58.)

Ms. Iley saw DPM Bark on June 23, 2023, complaining of left foot pain with tingling and swelling. (Tr. 3787.) Examination of the left lower extremity showed no appreciable edema, palpable pedal pulses, sensation grossly intact to light touch, no significant Tinel sign at the foot level, no notable weaknesses with dorsiflexion, plantar flexion, eversion, or inversion, and no crepitus on range of motion. (*Id.*) DPM Bark told Ms. Iley her symptoms could be neurologic and related to her back problems; she recommended Ms. Iley get an EMG and NCV and gave her a Tubigrip to help with swelling. (Tr. 3787-88.)

Ms. Iley went to the Avita Hospital ER the next day, complaining of right foot pain after stumbling and falling. (Tr. 3781-86.) Her motor function and gait were intact (Tr. 3785), but

16

she walked with discomfort (Tr. 3786).  An x-ray showed no acute fracture or dislocation.  (*Id.*)  Ms. Iley was discharged with a prescription for naproxen 500mg.  (*Id.*)

On June 28, 2023, Ms. Iley underwent an EMG/NCV of the bilateral upper extremities.  (Tr. 3953-54; *see also* Tr. 3779.)  It showed electrodiagnostic evidence of bilateral median mild mononeuropathy at the wrist, consistent with carpal tunnel syndrome.  (Tr. 3954.)

Ms. Iley returned to see Dr. Fitch for back pain on July 17, 2023.  (Tr. 4438-41.)  On examination, she could walk heel/toe, and she had decreased sensation of the right lateral thigh, positive hip provocative test, and positive Tinel's on the right.  (*Id.*)  Dr. Fitch reviewed the recent EMG and MRIs of the lumbar and cervical spine and referred Ms. Iley to neurology to evaluate leg numbness and giving way that was not explained by the lumbar MRI.  (Tr. 4438-49.)  He also ordered physical therapy for low back pain and a right SI joint injection.  (*Id.*)

On July 25, 2023, Ms. Iley underwent an EMG and nerve conduction study of the lower extremities as ordered by DPM Bark.  (Tr. 5367.)  It showed no evidence for left lumbosacral radiculopathy, lumbosacral plexus disorder, sciatic neuropathy, peroneal neuropathy, tibial neuropathy, tarsal tunnel syndrome, polyneuropathy, or other peripheral nerve disorder of the left lower limb.  (*Id.*)

On August 1, 2023, at Dr. Goudy's referral, Ms. Iley attended a new patient appointment with Steven A. Severyn, M.D., at Spine Care.  (Tr. 4674.)  She reported lower back pain that was alleviated by rest, water, and physical therapy and exacerbated by cold weather.  (*Id.*)  She also endorsed tingling in the legs that lasted a few minutes at a time, denied instability symptoms, and said she used a cane and walker at home at times.  (Tr. 4675.)  Examination of the lumbar spine showed tenderness of bilateral lumbar paravertebral, triceps, and trapezius muscles.  (Tr. 4680.)

Dr. Severyn reviewed the recent lumbar MRI (Tr. 4675-76), prescribed a TENS unit, and recommended aquatic therapy and continued medication management.  (Tr. 4680-81.)

Ms. Iley went to the Ativa Ontario ER on September 9, 2023, complaining of dizziness, back pain, and leg pain that was "much worse than usual."  (Tr. 4718.)  She denied recent injury or falls.  (*Id.*)  A physical examination showed normal coordination and range of motion throughout, no focal or cranial nerve deficit, mild left leg weakness with pressing down, and mild weakness with push-pull of the arms.  (*Id.*)  An EKG and labs were normal.  (Tr. 4728-29.)  Ms. Iley was discharged after being given Meclizine for dizziness and Toradol and Norflex for back and leg pain.  (Tr. 4729.)

Ms. Iley attended a neurology follow-up on September 19, 2023.  (Tr. 5250-56.)  She reported disequilibrium, lightheadedness, uncontrolled pain, and recent falls, but also said she was independent in all ADLs.  (Tr. 5250-52.)  She said that since her recent ER visit for dizziness, her symptoms had become intermittent and were associated with major position changes.  (Tr. 5252.)  Orthostatic vital signs were negative in the office.  (Tr. 5250-51.)  APRN Atwood increased Ms. Iley's Lyrica dose to 200mg.  (*Id.*)  A physical examination was normal except for some mild to moderate weakness in the upper and lower extremities.  (Tr. 5254-56.)

At CNP Faneilo's referral, Ms. Iley attended physical therapy for arthritis of the right knee twice a week between September 27 and December 20, 2023.  (Tr. 4807-10 (dup. at Tr. 4839-51, 5382-83) (12/4/2023), 4855-62 (11/20/2023), 4863-70 (11/15/2023), 4904-11 (11/10/2023), 4937-42 (11/6/2023), 5106-13 (10/16/2023), 5114-21 (10/13/2023), 5122-29 (10/9/2023), 5138-50 (10/4/2023), 5185-92 (9/27/2023), 5401-03 (12/20/2023).)  Ms. Iley consistently reported pain between 3/10 and 5/10, demonstrated decreased range of motion in the knees, and had mild to moderate weakness in the right knee of 3/5 or 4/5.  (*See* Tr. 4808-09,

18

4858, 4866, 4907, 4940, 5109, 5117, 5125, 5141, 5189, 5402.)  Upon discharge, she had partially achieved her goals of reducing pain in the right knee, improving strength to enable rising from a chair, and negotiating steps without knee pain.  (Tr. 5401.)  CNP Faneilo prescribed a cane on December 12, 2023.  (Tr. 5417.)

At a November 1, 2023 neurology appointment, Ms. Iley reported disequilibrium, lightheadedness, and worsening right hand numbness and pain.  (Tr. 4972.)  A physical examination remained unchanged from the September neurology appointment.  (Tr. 4975-77.)  APRN Atwood reviewed a CTA of the head and neck from October 5, 2023, that did not reveal any new abnormalities but showed a cavernoma that had been seen on previous imaging.  (Tr. 4974.)  She also reviewed the EMG of the bilateral upper extremities from June 2023.  (Tr. 4973.)  Based on this imaging and reported symptoms, APRN Atwood continued Lyrica 200mg and referred Ms. Iley to neurosurgery and orthopedic surgery.  (Tr. 4972.)  She also encouraged contacting an endocrinologist to ensure hormones/adrenal issues were not contributing to her symptoms of lightheadedness.  (Tr. 4974.)

On November 3, 2023, Ms. Iley saw DPM Bark at Avita Galion Podiatry to treat left foot pain.  (Tr. 4954-65.)  She reported her pain was 3/10 at rest and 6/10 with activity.  (Tr. 4958.)  On examination, she displayed tenderness to palpation on the left heel at the planter medial calcaneal tubercle, a mild edema, gastric equinus, and no weakness or instability.  (*Id.*)  DPM Bark reviewed previous x-rays that showed a very small plantar medal calcaneal spur and diagnosed left plantar fasciitis, left equinus, and left heel spur.  (*Id.*)  She performed a lidocaine injection in the left plantar fascia for pain relief, advised stretching and arch support, and set a follow-up in six weeks.  (Tr. 4957.)

19

Ms. Iley returned to see DPM Bark on December 15, 2023.  (Tr. 5388-89.)  She reported constant left foot pain of 5/10, saying the injection only helped for a couple of days.  (Tr. 5388.)  Examination of the left lower extremity revealed tenderness to palpation, erythema, and edema.  (*Id.*)  DPM Bark discussed treatment options of surgery, physical therapy, or a cast with no weightbearing for six weeks.  (Tr. 5389.)  Ms. Iley elected to try a fiberglass waterproof cast.  (Tr. 5388-89.)  On December 19, she returned to the office because she fell on her cast and cracked it, then cut it off.  (Tr. 5392.)  She requested a CAM walker boot.  (*Id.*)  DPM Bark prescribed a boot but said that avoiding surgical intervention would require cast immobilization 100% of the time, non-weightbearing, for six weeks.  (*Id.*)

On December 27, 2023, Ms. Iley saw Carter Battista, D.O., at OhioHealth Physician Group Interventional Pain Management.  (Tr. 5404-08.)  She wore her walking boot and reported low back and leg pain that increased with standing, lifting, bending, twisting, sit-to-stand, walking, using stairs, weather changes, and in the morning and evening.  (Tr. 5404-05.)  A physical examination showed decreased range of motion in the lumbar spine with extension and bilateral rotation, lumbar paraspinal tenderness bilaterally, positive axial loading bilaterally, and decreased range of motion and tenderness to palpation in the bilateral knees.  (Tr. 5407.)  Dr. Battista increased Ms. Iley's dose of Norco and restarted on cyclobenzaprine.  (Tr. 5404.)

Throughout 2023, Ms. Iley also continued to see her primary care provider, Dr. Goudy, regularly.  (Tr. 3822-26 (4/19/2023), 4739-47 (8/3/2023), 4912-29 (11/8/2023).)  She consistently reported fatigue, leg swelling, back pain, dizziness, weakness, light-headedness, and headaches.  (Tr. 3822, 4739, 4915-16.)  In April and August, she reported falling due to weakness.  (Tr. 3825, 4743.)  A physical examination in April showed 4/5 strength in the right lower extremity (Tr. 3825), but examinations were otherwise normal.  (Tr. 4743, 4919.)

20

On January 16, 2024, an MRI of Ms. Iley's right knee showed: mild medial compartment osteoarthritis with suggestion of minimal free-edge fraying of the posterior horn of the medial meniscus; mild-to-moderate patellofemoral compartment osteoarthritis; mild lateral compartment osteoarthritis without evidence of lateral meniscal tear; and prior lateral patellar retinaculum release with small joint effusion.  (Tr. 5415.)

### 2. Opinion Evidence

On December 24, 2022, state agency medical consultant James Cacchillo, M.D., conducted a physical RFC assessment.  (Tr. 206-08, 215-17.)  He opined that Ms. Iley required the ability to change positions once per hour for ten minutes at a time and could: occasionally lift/carry up to 10 pounds and frequently lift/carry less than 10 pounds; could stand or walk 2 hours and sit about 6 hours in an 8-hour workday; never climb ladders, ropes, or scaffolds; occasionally balance, stoop, kneel, crouch, crawl, and climb ramps or stairs with a handrail; occasionally perform foot controls, and frequently handle, finger, and feel.  (Tr. 206-07, 215-16.) Dr. Cacchillo also opined that Ms. Iley must have no exposure to hazards such as unprotected heights or the operational control of dangerous moving machinery (Tr. 206, 215), could not perform tasks requiring sharp or precise binocular vision or precise depth perception (Tr. 207, 216), and should avoid excessive vibrations and concentrated exposure to fumes dusts, odors, gases, and pulmonary irritants (*Id.*).  He noted that he had adopted the prior ALJ's physical RFC determination from October 12, 2021, pursuant to AR 98-4.  (Tr. 208, 217.)

On August 16, 2023, on reconsideration, state agency medical consultant Jose Ruiz, M.D., affirmed Dr. Cacchillo's findings, concluding that they were supported and consistent with the medical evidence.  (Tr. 228, 240.)

**C.**     **Hearing Testimony**

At the hearing on February 14, 2023, Ms. Iley responded to questioning from the ALJ and her attorney.  (Tr. 123-33.)  A Vocational Expert ("VE") also testified.  (Tr. 134-45.)

The VE testified that a hypothetical individual of Plaintiff's age, education and work experience, with the functional limitations described in the ALJ's RFC determination could perform Ms. Iley's prior work as generally performed but not as actually performed.  (Tr. 135-37.)  Other jobs would also be available, including document preparer, surveillance system monitor, and telephone quotations clerk.  (Tr. 137.)  If the individual had the physical limitations from the prior ALJ's RFC, they could not perform Ms. Iley's prior work but could perform representative positions in the national economy, including document preparer, surveillance system monitor, and address clerk.  (Tr. 139-40.)  The VE also testified that it would preclude competitive employment if the person would either be off task 10% of the time or absent one day a month (including arriving late/leaving early, being sick, or attending appointments) on an ongoing and consistent basis.  (Tr. 141.)  She further testified that the acceptable amount of absenteeism was no more than six days per year.  (*Id.*)

### III.     Standard for Disability

Under the Social Security Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work

22

experience, engage in any other kind of substantial gainful work which exists in the national economy[.]

42 U.S.C. § 423(d)(2)(A).

To make a determination of disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations, summarized as follows:

1.      If the claimant is doing substantial gainful activity, he is not disabled.

2.      If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.      If the claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the claimant is presumed disabled without further inquiry.

4.      If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if the claimant's impairment prevents him from doing past relevant work.  If the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.      If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. § 404.1520;[2] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).  Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.  *See Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner at Step Five to establish whether the claimant has the RFC and vocational factors to perform other work available in the national economy.  *Id.*

---

[2] The DIB and SSI regulations cited herein are generally identical.  Accordingly, for convenience, in most instances, citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq.  The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds with 20 C.F.R. § 416.920).

23

## IV.    Law & Analysis

### A.    Standard of Review

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record. *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009) ("Our review of the ALJ's decision is limited to whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence.").

When assessing whether there is substantial evidence to support the ALJ's decision, the Court may consider evidence not referenced by the ALJ. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Hum. Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Hum. Servs.*, 889 F.2d 679, 681 (6th Cir. 1989)). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). "'The substantial-evidence standard . . . presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.'" *Blakley*, 581 F.3d at 406 (quoting *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)). Therefore, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Even if substantial evidence supports a claimant's position, a reviewing court cannot overturn the

24

Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

Although an ALJ decision may be supported by substantial evidence, the Sixth Circuit has explained that the "'decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007) (citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir. 2004))).  A decision will also not be upheld where the Commissioner's reasoning does not "build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

**B.      First and Third Legal Issues: The RFC is Supported by Substantial Evidence**

Ms. Iley presents a combined argument on the first and third legal issues listed in her assignment of error, asserting that the ALJ "failed to identify the evidence supporting [her] RFC finding" and in particular "failed to identify evidence supporting improvement" in her impairments since a prior ALJ decision in October 2021.  (ECF Doc. 9, pp. 18-26.)  She also asserts that the ALJ failed to consider relevant evidence.  (*Id.* at pp. 22-26, 31; *see* ECF Doc. 13, pp. 3-5.) [3]  The Commissioner argues in response that the ALJ's RFC limitations were supported by substantial evidence, and that the ALJ appropriately considered the RFC findings from the prior ALJ decision under the applicable legal standard.  (ECF Doc. 12, pp. 10-12.)

---

[3] Ms. Iley also asserts within this argument that the ALJ erred by determining an RFC without the benefit of a medical opinion.  (ECF Doc. 9, pp. 20-21.)  That argument will be addressed in Section IV.D., *infra*.

### 1.    The ALJ Was Not Required to Identify Evidence of "Improvement"

Before assessing the adequacy of the ALJ's RFC findings in this case, this Court must first ensure that the correct legal standard is applied.  Ms. Iley asserts in her third legal issue that "[t]he ALJ erred when failing to find evidence of improvement" (ECF Doc. 9, p. 18), and argues in support that "it is inaccurate that the record shows improvement in physical functioning" since the prior ALJ decision in October 2021 (*id.* at p. 17).  While Ms. Iley's focus on evidence of "improvement" may have been appropriate under the standard articulated by the Sixth Circuit in *Drummond v. Comm'r of Soc. Sec.*, 126 F.3d 837 (6th Cir. 1997), that standard was clarified by the court in *Earley v. Commissioner of Social Security*, 893 F.3d 929 (6th Cir. 2018).

In *Drummond*, the Sixth Circuit cited "principles of res judicata" in holding: "Absent evidence of an improvement in a claimant's condition, a subsequent ALJ is bound by the findings of a previous ALJ."  126 F.3d at 841-42.  The Social Security Administration then adopted a related Acquiescence Ruling.  *See* AR 98-4(6), 63 Fed. Reg. 29771, 29773 (June 1, 1998).  But the Sixth Circuit reexamined *Drummond* in *Earley*, clarifying that "res judicata only 'foreclose[s] successive litigation of the very same claim,'" while "'a claim that one became disabled in 1990 is not the same as a claim that one became disabled in 1994.'"  893 F.3d at 933 (citations omitted).  The *Earley* court therefore found that res judicata does not apply when a claimant applies for a new disability period, but noted that "principles" of res judicata—like "[f]inality, efficiency, and the consistent treatment of like cases"—are still honored when an ALJ "consider[s] what an earlier judge found with respect to a later application and . . . consider[s] th[e] earlier record."  *Id.* (citations omitted).  The court accordingly held that "it is fair for an administrative law judge to take the view that, absent new and additional evidence, the first administrative law judge's findings are a legitimate, albeit not binding, consideration in reviewing a second application."  *Id.*  Further explaining that "[f]resh review is not blind

26

review," the court specified that "[a] later administrative law judge may consider what an earlier

judge did if for no other reason than to strive for consistent decision making."  *Id.* at 934.

In this case, the ALJ provided the following explanation for differences between the

physical RFC she adopted and some of the prior ALJ's physical RFC limitations:

> I did not adopt the prior RFC findings from the October 2021 ALJ decision [].
> Though the alleged onset date of disability is just after the prior findings, for the
> roughly 2.5 month period remaining before her date last insured, many of the ALJ
> findings were not well supported, such as requiring a sit/stand option, findings of
> severe migraine headaches and asthma (leading to limits on noise, light, dust, etc)
> and finding her mental impairments were severe. . . . While I have adopted some of
> the prior ALJ findings, such as a range of sedentary work, generally speaking I find
> improvement, or simply that the prior ALJ findings were not well supported by the
> evidence after the decision and before the date last insured, such that they cannot
> be adopted as a *Drummond* precedent. . . . Also, the current record, including the
> brief period after the prior ALJ decision and before the date last insured, does not
> support a limitation on sitting to a specific number of hours beyond that typically
> required of sedentary work, or the need for changing positions (she testified both
> that she finds it necessary to change positions and that changing positions is painful,
> but, as noted, the evidence, and particularly the objective evidence, showing only
> mild findings in the lumbar spine, as well as noted improvement with arthritis in
> the left knee following her knee replacement, do not support this limit in the period
> before me). Her very mild to normal findings on repeated cervical imaging do not
> support limits on turning the head. Her migraines and asthma appear to be well
> controlled and/or do not otherwise cause more than minimal limits on function and,
> therefore, the environmental limitations adopted are no longer supported. Her mild
> findings including carpal tunnel syndrome do not warrant vibratory limits which,
> in any event, are unlikely to be relevant to sedentary occupations.

(Tr. 23 (emphasis added).)  Thus, the ALJ explained that she found some of the prior ALJ's RFC

limitations "not well supported" by the records relevant to "the brief period after the prior ALJ

decision and before the date last insured"—i.e., the disability period applicable to Plaintiff's DIB

claim.  (*Id.*)  While the ALJ also said "generally speaking I find improvement," she qualified that

by specifying "*or* simply that the prior ALJ findings were not well supported by the evidence

after the decision and before the date last insured."  *Id.* (emphasis added).  Thus, consistent with

*Earley*, the ALJ "consider[ed] what an earlier judge did if for no other reason than to strive for

27

consistent decision making," 893 F.3d at 934, and did not rely only on improvement to explain the differences between her RFC and the prior ALJ's RFC.  Further, the ALJ was not subject to the now-defunct *Drummond* rule that might otherwise have bound her to adopt the prior ALJ's RFC "[a]bsent evidence of an improvement in a claimant's condition."  126 F.3d at 841-42.  The undersigned therefore finds the ALJ was not required to identify evidence of improvement to support her divergence from the prior ALJ's RFC, and that the ALJ adequately explained that her distinct RFC limitations were based on general improvement *or* the lack of support for the specified limitations in the records relevant to the new disability period.  Accordingly, the undersigned finds that Ms. Iley's third legal argument—that the ALJ "erred when failing to identify evidence of improvement"—lacks merit under applicable legal standards.

> **2.** **Plaintiff Did Not Meet Her Burden to Show that the ALJ's Physical RFC Lacked the Support of Substantial Evidence**

Ms. Iley argues generally that "the ALJ failed to identify substantial evidence supporting the RFC finding."  (ECF Doc. 9, p. 20.)  More specifically, she argues that the ALJ "failed to explain how the consistently abnormal findings do not support greater limitations as indicated in the [state agency medical opinions] and alleged by Plaintiff," including "abnormal clinical findings relating to the cervical spine" (*id.* at pp. 22-23), records relating to her "manipulative limits" (*id.* at pp. 23-24), and evidence relating to her "knee impairments" (*id.* at pp. 24-26).

A claimant's RFC "is the most [she] can still do despite [her] limitations."  20 C.F.R. § 404.1545(a)(1).  An ALJ is charged with assessing a claimant's RFC "based on all the relevant evidence in [the] case record."  *Id.*; *see also* 20 C.F.R. § 404.1546(c) "(If your case is at the administrative law judge hearing level . . ., the [ALJ] . . . is responsible for assessing your [RFC].")"; *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 157 (6th Cir. 2009) ("The responsibility for determining a claimant's [RFC] rests with the ALJ, not a physician.").

28

Here, the ALJ found Ms. Iley had the RFC to perform sedentary work with the following additional limitations:

> occasionally climb ramps and stairs but never climb ladders, ropes, or scaffolds; occasionally stoop, kneel, crouch, and crawl; occasionally push, pull, and use of foot controls with her lower extremities; frequently handle, feel, and finger; and occasionally reach overhead. She must avoid work around hazards such as unprotected heights or work in proximity to exposed, moving mechanical parts, and she cannot engage in occupational driving. She can perform tasks that do not require sharp binocular vision (such as reading fine print), good peripheral vision on the left (such as would be required to see small objects such as coins without turning the head left), or precise depth perception (such as is required to thread a needle).

(Tr. 18.)  Under SSA regulations, sedentary work requires "lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools." *See* 20 C.F.R. § 404.1567(a); SSR 83-10, 1983-1991 Soc. Sec. Rep. Serv. 24 (Jan 1, 1983). Sedentary work may also require up to "occasional" walking or standing. *Id.*

Before adopting this RFC, the ALJ found at Step Two that Ms. Iley had the following severe physical impairments: amblyopia, exotropia, and strabismus of the left eye; fibromyalgia; obesity; degenerative disc disease of the cervical, thoracic, and lumbar spine; degenerative joint disease of the knees status post left total knee replacement; bilateral carpal tunnel syndrome; autoimmune disorder; plantar fasciitis and osteoarthritis of the right ankle; and diabetes.  (Tr. 13.)  She also explained why she found other physical impairments were not severe but specified that she "considered all of the claimant's medically determinable impairments, including those that are not severe, when assessing her [RFC]."  (Tr. 14-15.)

At Step Four, the ALJ acknowledged the prior ALJ's RFC (Tr. 19) and Ms. Iley's reported symptoms and activities of daily living during the relevant disability period (Tr. 19-20) before providing a detailed discussion of her treatment records, the objective medical evidence (Tr. 20-22), and the medical opinion evidence (Tr. 23-24).  In her discussion of the medical

records and findings, the ALJ identified and discussed specific evidence relating to Ms. Iley's gait and use of assistive devices (Tr. 20), limited examination findings supporting a fibromyalgia diagnosis (*id.*), "objective exam and imaging findings" that mostly "indicate[d] mild conditions," except for "grade 3 to 4 chondromalacia on the left[ knee], [which] was resolved by the total knee replacement" (Tr. 21), physical examination findings that "were generally normal, other than at times noting some tenderness and limited range of motion" and "variable findings ranging from normal to mild weakness, tenderness, and decreased sensation and range of motion at times, with sometimes positive Tinels at the wrists" (Tr. 21-22), and "extensive physical therapy, with at least some benefit" (Tr. 21).

As to the medical opinion evidence, the ALJ found the medical opinions of the state agency medical consultants partially persuasive, but unpersuasive and "not well supported" during the new disability period with respect to environmental limitations for migraines or asthma, "a sit/stand option," limitations in sitting beyond sedentary standards, a need to change positions, limits on turning her head, and "vibratory limits." (Tr. 23.) In support of these distinctions, the ALJ highlighted evidence of well controlled migraines and asthma, mild lumbar spine findings, improvement in the left knee following a knee replacement, very mild to normal findings on cervical imaging, and mild findings relating to carpal tunnel syndrome. (*Id.*)

Having considered all of this evidence as specified above, the ALJ concluded that "the claimant is limited to sedentary exertional work with the above-noted postural limitations" based on "consideration of generalized pain, with knee and foot problems as well as symptoms regarding the neck, mid back, low back, and hands[.]" (Tr. 22.)

The undersigned now turns to Ms. Iley's specific challenges to the ALJ's findings. As to Ms. Iley's general argument that the ALJ "failed to explain how [her] consistently abnormal

findings do not support greater limitations" (ECF Doc. 9, p. 22), the undersigned finds this general assertion to be unfounded since the ALJ adopted parts of the state agency medical opinions and specifically identified the evidence she relied on in finding other portions of those opinions unpersuasive and "not well supported" during the new disability period (Tr. 23).

Ms. Iley also argues that the ALJ erred in finding "'mild to normal findings on repeated cervical imaging do not support limits on turning the head'" because the record also contains "abnormal clinical findings relating to the cervical spine," including findings of decreased range of motion, tenderness, and trigger points.  (ECF Doc. 9, p. 22-23 (quoting Tr. 23).)  While the ALJ did not discuss all of the clinical examination findings relating to the cervical spine that are identified in Plaintiff's brief, she was not required to discuss every piece of evidence to render a decision supported by substantial evidence.  *See Boseley v. Comm'r of Soc. Sec. Admin.*, 397 F. App'x 195, 199 (6th Cir. 2010) (citing *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 507-08 (6th Cir. 2006) (per curiam)).  Here, the ALJ generally acknowledged that Ms. Iley's physical examination findings sometimes showed "tenderness[] and decreased . . . range of motion" (Tr. 22) and accurately characterized her cervical imagery as "mild to normal" (Tr. 23).  Ms. Iley has failed to show that the ALJ's failure to specifically discuss additional clinical findings relating to her cervical spine deprived the cervical RFC limitations of the support of substantial evidence.

Ms. Iley next argues that the ALJ erred in finding her "'mild findings including carpal tunnel syndrome do not warrant vibratory limits'" because "[t]he record contains consistently abnormal clinical findings" like 4/5 or decreased strength in the upper extremities and hands, positive Tinel's, tenderness, and decreased sensation in the hand.  (ECF Doc. 9, p. 23-24 (quoting Tr. 23).)  But the ALJ acknowledged electrodiagnostic testing showing mild carpal tunnel syndrome (Tr. 21) and physical examinations findings memorializing weakness in the

31

elbows and grip (*id.*), positive Tinels at the wrists (Tr. 22), and general findings of "mild weakness, tenderness, and decreased sensation and range of motion at times" (*id.*).  The undersigned concludes that Ms. Iley has failed to show that the ALJ's failure to specifically discuss additional examination findings as identified in her brief deprived an RFC excluding "vibratory limits" of the support of substantial evidence.

Finally, Ms. Iley argues that "the ALJ failed to identify evidence supporting improvement in Plaintiff's knee impairments" and further that the ALJ's specific finding that her "'grade 3 to 4 chondromalacia on the left  . . . was resolved by the total knee replacement'" was "contradicted by the record."  (ECF Doc. 9, p. 24 (quoting Tr. 21).)  For the reasons discussed in Section IV.B.1., *supra*, the ALJ was not required to identify evidence showing "improvement" in Plaintiff's impairments.  Therefore, the undersigned will concentrate on Plaintiff's more specific assertion that the evidentiary record "contradicted" the ALJ's finding that Plaintiff's "grade 3 to 4 chondromalacia on the left  . . . was resolved by the total knee replacement."  (Tr. 21.)  The evidence post-dating Ms. Iley's left knee replacement that is highlighted by Plaintiff includes:

- a June 2022 treatment note indicating that Ms. Iley had weakness, her knee pain increased with standing and walking, and she was given an increased dose of Norco for pain (ECF Doc. 9, p. 24 (citing Tr. 865));

- multiple rounds of physical therapy for the knees (*id.* at pp. 24-25 (citing Tr. 901-12, 923-25, 929-32, 936-38, 940-53, 961-63, 982-86, 4807-10, 4839-51, 4855-70, 4904-11, 4937-53, 5106-29, 5138-50, 5185-202, 5382-83, 5401-03));

- multiple ER trips for knee pain (*id.* (citing Tr. 543-51, 654-68, 3815-21));

- physical examination findings of 4/5 strength, tenderness, crepitus, and decreased range of motion in one or both knees (*id.* (citing Tr. 700-01, 758, 3791, 3846, 3861, 4976, 4999-5000, 5255)).

- A December 2023 prescription for a cane to address chondromalacia patellae and arthritis of the right knee (*id.* at p. 25 (citing Tr. 5417)); and

- a January 2024 MRI of the right knee showing mild osteoarthritis (*id.* (citing Tr. 5415)).

Notably, none of the identified evidence contradicts the ALJ's specific finding that the "grade 3 to 4 chondromalacia" in Ms. Iley's left knee was resolved following her left knee replacement. Indeed, the ALJ accurately cited a left knee x-ray from February 2023 that revealed no more than "findings consistent with the total knee replacement with respect to the left knee." (Tr. 21 (citing Tr. 3664 ("Left knee: Tricompartmental arthroplasty without evidence of hardware complication. Normal soft tissues")).) Further, none of the findings identified in Plaintiff's brief are necessarily inconsistent with the ALJ's conclusions that "[m]ost of the objective exam and imaging findings indicate mild conditions" (Tr. 21), that Plaintiff "engaged in extensive physical therapy, with at least some benefit" (*id.*), and that the "[p]hysical exam findings were generally normal, other than at times noting some tenderness and limited range of motion," some mild weakness in the legs and moderate weakness in right hip flexion (*id.*), and "variable examination findings ranging from normal to mild weakness, tenderness, and decreased sensation and range of motion at times" (Tr. 22). The undersigned concludes that Ms. Iley has failed to show that the ALJ's failure to specifically discuss the additional identified evidence relating to her knee impairments deprived the ALJ's sedentary RFC of the support of substantial evidence.

Even if the evidence cited in Plaintiff's brief could supply substantial evidence to support greater physical RFC limitations than those adopted by the ALJ in this case, this Court cannot overturn the ALJ's contrary RFC findings "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones*, 336 F.3d at 477. For the reasons set forth above, the undersigned concludes that Ms. Iley has not met her burden to show that the physical RFC adopted by the ALJ lacked the support of substantial evidence. Instead, the evidence is such that "a reasonable mind might accept as adequate to support a conclusion" that Plaintiff is capable of sedentary work with additional limitations as set forth in the RFC. *Besaw*, 966 F.2d at 1030.

For the reasons set forth above, the undersigned concludes that the ALJ adequately articulated the basis for her physical RFC findings, adopted an RFC that was supported by substantial evidence, and built an accurate and logical bridge between the evidence and the result.  Accordingly, the undersigned finds the first and third legal issues to be without merit.

**C.      Second Legal Issue: The ALJ Properly Evaluated Plaintiff's Subjective Symptoms Pursuant to SSR 16-3p**

In her second legal issue, Plaintiff argues that the ALJ did not properly evaluate her subjective complaints under SSR 16-3p because she "failed to consider the frequency and extent of Plaintiff's treatment."  (ECF Doc. 9, p. 26; *see id.* at pp, 1, 18.)  Ms. Iley asserts that this alleged failure constitutes error because (1) "Plaintiff's treatment history contradicts the ALJ's assessment of improvement" and (2) the "frequent treatment . . . would lead to absenteeism." (*Id.* at p. 26.)  As explained in Section IV.B.1., *supra*, the ALJ was not bound by the prior ALJ's RFC findings "[a]bsent evidence of an improvement," as previously required under *Drummond*, 126 F.3d at 841-42, but was merely permitted to consider the prior findings "if for no other reason than to strive for consistent decision making" under *Earley*, 893 F.3d at 933-34.  The undersigned will therefore consider the first argument only to the extent that Plaintiff can show the ALJ's explicit statements about "improvement" are contradicted by the treatment records.

**1.      Legal Standard for Evaluation of Subjective Symptoms**

As a general matter, "an ALJ is not required to accept a claimant's subjective complaints and may properly consider the credibility of a claimant when making a determination of disability." *Jones*, 336 F.3d at 476; *see Alexander v. Kijakazi*, No. 1:20-CV-01549, 2021 WL 4459700, at *13 (N.D. Ohio Sept. 29, 2021) ("An ALJ is not required to accept a claimant's subjective complaints.") (citing *Jones*, 336 F.3d at 476); *see also* 20 C.F.R. § 404.1529(a) and SSR 16-3p, *Evaluation of Symptoms in Disability Claims*, 82 Fed. Reg. 49462, 49463 (Oct. 25,

34

2017) (explaining that a claimant's statements of symptoms alone are not sufficient to establish the existence of a physical or mental impairment or disability).

Under the two-step process used to assess the limiting effects of a claimant's symptoms, a determination is first made as to whether there is an underlying medically determinable physical or mental impairment that could reasonably be expected to produce the claimant's symptoms.  SSR 16-3p, 82 Fed. Reg. 49462, 49463; *Rogers v. Comm'r Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007) (citing 20 C.F.R. § 416.929(a)).  If that requirement is met, the second step is to evaluate of the intensity and persistence of the claimant's symptoms to determine the extent to which they limit the claimant's ability to perform work-related activities.  SSR 16-3p, 82 Fed. Reg. 49462, 49463; *Rogers*, 486 F.3d at 247.  There is no real dispute that the first step is met in this case (Tr. 24), so the discussion will focus on the ALJ's compliance with the second step.

In undertaking this analysis, an ALJ should consider objective medical evidence, a claimant's subjective complaints, information about a claimant's prior work record, and information from medical and non-medical sources.  SSR 16-3p, 82 Fed. Reg. 49462, 49464-49466; 20 C.F.R. § 404.1529(c)(3).  Factors relevant to a claimant's symptoms include daily activities, types and effectiveness of medications, treatment received to address symptoms, and other factors concerning a claimant's functional limitations and restrictions due to pain or other symptoms.  SSR 16-3p, 82 Fed. Reg. at 49465-49466; 20 C.F.R. § 404.1529(c)(3).  An ALJ need not discuss all regulatory factors he considers, only those he finds pertinent to the case.  SSR 16-3p, 82 Fed. Reg. at 49467.

### 2. The ALJ Accurately Addressed "Improvement" in Her Symptom Analysis

Ms. Iley asserts that her "treatment history contradicts the ALJ's assessment of improvement, is consistent with her allegations of debilitating symptoms, and supports greater limitations." (ECF Doc. 9, p. 26.)  She then cites numerous records in support of her argument

that the treatment records show her "symptoms are ongoing and not improved." (*Id.* at p. 28-29.) But the ALJ was not required to find "improvement" to justify her findings regarding Plaintiff's subjective symptoms or the RFC.  Indeed, even if the treatment records cited by Plaintiff provide substantial evidence to support a more restrictive RFC, they still do not warrant remand "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones*, 336 F.3d at 477.  Thus, the question before this Court is whether the ALJ's explanations and findings regarding Ms. Iley's subjective complaints lacked the support of substantial evidence.

The ALJ's written decision reveals that she considered Ms. Iley's subjective complaints, including her allegations of severe fatigue and pain, tingling/burning in the hands, frequent falls, difficulty and pain with certain postural activities, needing frequent bathrooms breaks, using a cane/brace, and trouble concentrating and focusing.  (Tr. 19-20.)  She also considered Ms. Iley's reported daily activities, including spending time with her grandchildren, watching television, managing her money, and spending time with others via email, text, and video chat.  (*Id.*)

The ALJ also considered medical evidence relevant to Ms. Iley's impairments, including objective diagnostic and examination findings, treatments prescribed to treat her conditions, and evidence of her response to treatment.  (Tr. 20-22.)  She acknowledged Ms. Iley's "generalized pain, with knee and foot problems regarding the neck, mid back, low back, and hands" when finding her limited to sedentary exertional work with additional limitations.  (Tr. 22.)

The ALJ also discussed the medical opinion evidence, finding the opinions of the state agency medical consultants partially persuasive, as reflected in the RFC, but unpersuasive as to certain limitations as discussed in Section IV.B.2., *supra*.  (Tr. 23-24.)

After outlining the evidence of Ms. Iley's symptoms, daily activities, medical records, and the medical opinions, the ALJ analyzed her subjective complaints as follows:

36

As for the claimant's statements about the intensity, persistence, and limiting effects of her mental symptoms, her subjective complaints regarding her mental symptoms are inconsistent with the evidence, including but not limited to the objective record. As noted, the vast majority of her mental status findings were normal, and treatment was essentially absent but for Cymbalta prescribed by rheumatology for her fibromyalgia and autoimmune disorder. The record does not document persistently or consistently reported medication side effects and changes were made when there had been issues. With respect to precipitating and aggravating factors, as noted, she did not typically make complaints about her mental health, so those factors are not consistently reported. Finally, her daily activities were reported to be fairly full to Dr. Dubey [].

The claimant's subjective complaints regarding her physical symptoms were also not fully consistent with the evidence. The objective evidence supports her complaints in part, such as some tenderness, limited range of motion, and quite variable findings as to weakness and loss of sensation, with no clear etiology noted for many of her symptoms, such as severe pain, dizziness, and paresthesias. Imaging and objective testing shows primarily minimal, mild, and negative findings, as noted above. Her course of treatment has been fairly involved, seeing many specialists, including neurology, rheumatology, primary care, orthopedics, cardiology and an adrenal specialist, as noted in the review of medical evidence, as well as many rounds of physical therapy. However, also as noted in the review of evidence, improvement was also reported, showing some benefit from the course of treatment. She did not consistently report intolerable side effects from medications. She reported that most activity was an aggravating factor, though she also reported that her doctors advised that activity was important to alleviate her pain, which is why she was trying to use a treadmill all times. Her reports regarding daily activities are variable but, as noted, she reported a fair range of activities to Dr. Dubey, some of her providers have repeatedly noted independence in her ADLs, and she testified at hearing she now lived alone, though she had friends over "nearly every day" who help her (she did not report this to her physicians, nor had she sought home health assistance). In summary, while the relevant factors are somewhat consistent with her complaints, they are not sufficiently consistent to warrant greater limitations in the RFC.

(Tr. 22-23 (emphasis added).)

The language underlined above is demonstrative of the limited extent to which the ALJ explicitly considered "improvement" in her assessment of Mr. Iley's subjective complaints and the RFC.[4]  The ALJ acknowledges abnormal examination findings that "support[] [Plaintiff's]

---

[4] As discussed in Section IV.B., *supra*, the ALJ also accurately found Ms. Iley's "grade 3 to 4 chondromalacia on the left" resolved following surgery (Tr. 21), that she "engaged in extensive physical therapy, with at least some

37

complaints in part," the lack of a clear etiology for Ms. Iley's complaints of "severe pain, dizziness, and paresthesias," the imaging and testing "show[ing] primarily minimal, mild, and negative findings," and Ms. Iley's "fairly involved course of treatment" with many different specialists and "many rounds of physical therapy," before noting that "improvement was also reported, showing some benefit from the course of treatment."  (Tr. 22.)  Ms. Iley's extensive references to treatment records in her brief (*see* ECF Doc. 9, pp. 28-29) do not undermine, and are not inconsistent with, the ALJ's description of a "fairly involved course of treatment" in which some "improvement was also reported, showing some benefit" (Tr. 22).  In the context of the entire written decision, the undersigned finds Ms. Iley has not met her burden to show that the ALJ's subjective symptom analysis—including her limited references to improvement with treatment—lacked the support of substantial evidence.

The ALJ considered the factors identified in SSR 16-3p, gave "specific reasons for the weight given to the individual's symptoms," and made findings that were "consistent with and supported by the evidence."  SSR 16-3p, 82 Fed. Reg. at 49467.  She also "clearly articulated [her reasoning] so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms."  (*Id.*)  In this context, the undersigned finds the ALJ adequately articulated her reasons for finding the reported "intensity, persistence and limiting effects" of Plaintiff's symptoms was not "entirely consistent" with the record.  (Tr. 22.)

### 3.     Plaintiff Has Not Shown That the Frequency of Her Medical Treatment Required the ALJ to Include Absenteeism Limitations in the RFC

Ms. Iley also argues that the ALJ erred in her analysis of Plaintiff's subjective complaints because she did not "acknowledge that ongoing treatment with 'neurology, rheumatology,

---

benefit" (*id.*), and that some of the state agency consultants' RFC limitations were no longer appropriate due to improvement or because they were not well supported by the evidence from the new disability period (Tr. 23).

primary care, orthopedics, cardiology, and an adrenal specialist', recovery from multiple surgeries, multiple rounds of physical therapy, and monthly treatment in the emergency room and hospital would result in excessive absenteeism." (ECF Doc. 9, p. 27 (quoting Tr. 22).)  Highlighting pain management, neurology, rheumatology, and emergency room visits (*id.* at pp. 28-29), Ms. Iley argues "[t]he ALJ was required to discuss the effect . . . Plaintiff's medically necessary appointments would have on the ability to sustain employment" (*id.* at p. 30) and committed reversible error when she failed to do so.  Highlighting the VE's testimony that absences in excess of once per month or six times per year would preclude competitive employment, she asserts that "the frequency of documented treatment would cause Plaintiff to [be absent] more than six times per year."  (ECF Doc. 9, pp. 29-30 (quoting Tr. 141, 144).)

This argument relies on several assumptions that are not borne out by the record.  First, Ms. Iley "asks this Court to simply *assume* that she needed the number of appointments that her medical professionals allegedly scheduled for her" when "in case after case in the Social Security context, it is standard operating procedure to require *evidence* to support subjective opinions and information."  *Beck v. Comm'r of Soc. Sec.*, No. 4:19-CV-2320, 2020 WL 5417536, at *3 (N.D. Ohio Sept. 10, 2020) (emphasis in original) (citations omitted).  In other words, Plaintiff suggests that this Court—and the ALJ before it—should assume that all of the medical appointments and emergency room visits in the record were "medically necessary" to treat her impairments.  (*See* ECF Doc. 9, p. 30.)  But Ms. Iley has not shown that the records required such a finding.  Indeed, the undersigned observes by way of example that numerous emergency room visits cited by Ms. Iley relate to minor health issues for which she was sent home after tests and imaging came back normal.  (*See, e.g.,* Tr. 996 (discharging with instructions to take Tylenol for an upper respiratory infection); 4882-83 (discharging with instructions to take Tylenol and Motrin and use ice to treat

a foot contusion); 5410 (discharging without ordering blood work or imaging for ear pain); Tr. 5393-94 (discharging after labs and tests were negative for cardiac and pulmonary concerns, finding chest discomfort likely secondary to a viral illness).

Second, Plaintiff also apparently expects this Court—and the ALJ before it—to assume that her treatment visits "could not be scheduled around work hours." *See Chaney v. Comm'r of Soc. Sec.*, No. 5:18 CV 2769, 2020 WL 789189, at *9 (N.D. Ohio Feb. 18, 2020) ("'[P]laintiff's current extrapolation of how many days she must have missed from work based on her medical record is faulty . . . in that it assumes she was required to miss entire days of work for each appointment.'") (quoting *Barnett v. Apfel*, 231 F.3d 687, 691 (10th Cir. 2000) and collecting cases).  Courts in this circuit have rejected similar arguments.  *See, e.g., Erickson v. Bisignano*, No. 5:25-CV-01606-SL, 2026 WL 1141181, at *17 (N.D. Ohio Apr. 28, 2026) (finding similar argument failed when plaintiff "provided no evidence to suggest that his appointments could not occur outside of work hours, or that those appointments would necessarily be work preclusive"), *report and recommendation adopted sub nom. Erickson v. Comm'r of Soc. Sec.*, 2026 WL 1506054 (N.D. Ohio May 29, 2026); *Smith v. Comm'r of Soc. Sec.*, No. 1:25-CV-1085, 2026 WL 32075, at *5 (N.D. Ohio Jan. 6, 2026) ("Smith has provided no evidence—legal, vocational, or otherwise—to support her statement that a 'medical appointment would occur during the work hour.' This dooms Smith's argument from the start."); *Walton v. Comm'r of Soc. Sec.*, No. 1:23-CV-01408, 2024 WL 3387300, at *20 (N.D. Ohio June 25, 2024) ("This Court need not, and indeed should not, start with an assumption that she would necessarily be absent every day she had a medical appointment."), *report and recommendation adopted*, 2024 WL 3933783 (N.D. Ohio Aug. 26, 2024); *Noe v. Kijakazi*, No. 5:22-CV-00144-EBA, 2023 WL 2382729, at *5 (E.D. Ky. Mar. 6, 2023) ("[M]ultiple courts in this circuit indicate 'that a claimant bears the burden of

40

showing that [her] appointments necessarily conflict with a work schedule and cannot be scheduled prior to work, after work, . . . on a non-work day,' or even during a lunch break.") (citations omitted); *Bray v. Comm'r of Soc. Sec.*, No. 1:13-CV-00040, 2014 WL 4377771, at *2 (S.D. Ohio Sept. 3, 2014) (agreeing with the magistrate judge "that Plaintiff has not presented any evidence that she would not be able to schedule sessions prior to work, after work, on a non-work day, or over a lunch hour to avoid missing work").  Although Ms. Iley "bore the burden of demonstrating that her appointments will necessarily interfere with work," *Noe*, 2023 WL 2382729 at *4 (citations omitted), she did not provide this Court or the ALJ with evidence that would require such a finding.

Finally, although it is Ms. Iley's burden to show that the RFC lacked the support of substantial evidence, she also asks this Court—and the ALJ before it—to disregard the medical opinions that found her capable of working without excessive absenteeism, even though "[m]any courts have rejected the argument that 'medical appointments alone, without additional evidence, are sufficient to require an absenteeism limitation in the RFC, particularly where there is no statement from a physician regarding absenteeism.'" *Molnar v. Comm'r of Soc. Sec.*, No. 1:23-CV-1314, 2024 WL 1521243, at *14 (N.D. Ohio Apr. 3, 2024) (quoting *Riggio v. Comm'r of Soc. Sec.*, No. 3:22 CV 997, 2023 WL 6225093, at *3 (N.D. Ohio Sept. 26, 2023) (citations omitted)); *see also Walton*, 2024 WL 3387300, at *21 (finding plaintiff did not show a lack of substantial evidence to support the RFC when the opinion evidence did not include absenteeism limitations); *Noe*, 2023 WL 2382729, at *5 ("'First and foremost, there is a lack of medical evidence or testimony from medical sources with respect to the appointments that she requires (and the duration and frequency of same) due to [her] impairments.'") (citation omitted).

41

For the reasons explained above, the undersigned finds Ms. Iley has not met her burden to show that the ALJ erred in evaluating her symptoms and treatment records or that the ALJ's analysis lacked the support of substantial evidence.  Accordingly, the undersigned finds the second legal issue to be without merit.

**D.      Fourth Legal Issue: The ALJ Did Not Fail to Develop the Record and Was Not Required to Obtain an Additional Medical Opinion**

In the fourth legal issue listed in her assignment of error, Ms. Iley argues that the ALJ "relied on an insufficient record" when she adopted an RFC without obtaining additional medical opinion evidence after "rejecting" the state agency medical opinions and the prior ALJ's RFC.[5] (ECF Doc. 9, pp. 34-35.)  In this situation, she asserts the ALJ "should have obtained a medical opinion prior to denying Plaintiff's claim."  (*Id*. at p. 35.)  The undersigned therefore turns to consideration of whether the ALJ was required to further develop the evidentiary record by ordering another medical opinion because she failed to adopt the state agency opinions verbatim.

**1.      The ALJ Did Not Have a Heightened Duty to Develop the Record**

At the hearing level, after the denial of benefits on initial review and reconsideration, the Sixth Circuit explains that an ALJ must act "as an examiner charged with developing the facts" and ensure that every claimant receives a full and fair hearing.  *Lashley v. Sec'y of Health & Hum. Services*, 708 F.2d 1048, 1051 (6th Cir. 1983) (quoting *Richardson v. Perales*, 402 U.S. 389, 411 (1971)).  Nevertheless, "while the ALJ must ensure that every claimant receives 'a full and fair hearing,' the ultimate burden of proving entitlement to benefits lies with the claimant."

---

[5] Notably, the ALJ did not wholly "reject" the state agency medical consultant opinions, which adopted the prior ALJ's RFC findings.  (ECF Doc. 9, p. 34; *see* Tr. 208, 217, 228, 240.)  Rather, the ALJ found the opinions partially persuasive as reflected in the RFC, but partially "unpersuasive for the same reasons [she] departed from the prior ALJ findings."  (Tr. 23.)  Thus, the ALJ did not "form[] an RFC without obtaining any opinion evidence."  (ECF Doc. 9, p. 20.)  Because the undersigned concludes that the ALJ did not fail to develop the record or err by adopting an RFC without obtaining further medical opinion evidence, this issue need not be addressed further herein.

*Moats v. Comm'r of Soc. Sec.*, 42 F.4th 558, 563 (6th Cir. 2022) (quoting *Duncan v. Sec'y of Health & Hum. Servs.*, 801 F.2d 847, 856 (6th Cir. 1986); citing 20 C.F.R. § 404.1512(a)), *cert. denied sub nom. Moats v. Kijakazi*, 143 S. Ct. 785 (2023); *see also Wilson v. Comm'r of Soc. Sec.*, 280 F. App'x 456, 459 (6th Cir. 2008); 20 C.F.R. § 416.912(a)(1) ("[Y]ou have to prove to us that you are blind or disabled."); 20 C.F.R. § 416.945(a)(3) ("[Y]ou are responsible for providing the evidence we will use to make a finding about your residual functional capacity.").

In special circumstances, the Sixth Circuit has held that an ALJ must "exercise a heightened level of care" in developing the record.  *Lashley*, 708 F.2d at 1051-52.  Heightened care is required for unrepresented claimants who are unfamiliar with hearing procedures and incapable of presenting an effective case.  *See Wilson*, 280 F. App'x at 459 (citing *Lashley*, 708 F.2d at 1051-1052); *Trandafir v. Comm'r of Soc. Sec.*, 58 F. App'x 113, 115 (6th Cir. 2003) (citing *Duncan*, 801 F.2d at 856).  In contrast, heightened care is not required for unrepresented claimants who demonstrate a grasp of the proceedings and adequately present their cases, *see Moats*, 42 F.4th at 564; *Wilson*, 280 F. App'x at 459, and certainly not for claimants who are represented by counsel at the hearing level, *see Stevenson v. Kijakazi,* No. 5:20CV2688, 2022 WL 4551590, at *13 (N.D. Ohio Sept. 29, 2022).

Ms. Iley has been represented since November 2022, including at her February 2024 hearing.  (Tr. 117, 243-46.)  The ALJ clearly did not have a heightened duty of care to develop the record in this case.

### 2.    The ALJ Did Not Fail in Her Duty to Develop the Record

Without specifically arguing for a heightened duty of care, Ms. Iley asserts that the ALJ's RFC lacked the support of substantial evidence because the ALJ did not adopt the state agency medical consultants' RFC limitations verbatim, and the evidentiary record "contains no medical

opinion or other assessment of Plaintiff's abilities and limitations."  (ECF Doc. 9, p. 35.)

Without additional medical opinion evidence, she asserts that the ALJ "was not permitted to

render a commonsense judgment about physical functioning resulting from the raw medical

evidence in the record."  (*Id.* at p. 34 (citing cases); *see also* ECF Doc. 13, p. 2.)

Ms. Iley bases this argument on a line of cases that originated with a district court

decision in *Deskin v. Comm'r of Soc. Sec.*, 605 F. Supp. 2d 908 (N.D. Ohio 2008), where the

judge articulated the following "general rule":

> where the transcript contains only diagnostic evidence and no opinion from a
> medical source about functional limitations (or only an outdated nonexamining
> agency opinion), to fulfill the responsibility to develop a complete record, the ALJ
> must recontact the treating source, order a consultative examination, or have a
> medical expert testify at the hearing.

*Id.* at 912.  The Commissioner responds that *Deskin* is a non-binding decision and conflicts with

Sixth Circuit precedent.  (ECF Doc. 12, pp. 12-13.)

As an initial matter, there is no evidence that the ALJ in this case failed or refused to

provide any requested assistance in developing the evidentiary record.  Ms. Iley's representative

submitted a prehearing brief (Tr. 464-72) and advised the ALJ at the February 2024 hearing that

the record was complete to the best of his knowledge (Tr. 118).  He did not raise any concerns

regarding the lack of updated medical opinion evidence relating to physical functioning, did not

ask the ALJ for assistance in obtaining additional medical opinion evidence from Plaintiff's

medical providers, and did not ask the ALJ to order a consultative physical examination.  (*See*

Tr. 118-20, 464-72.)  Since Ms. Iley was represented and bore "the ultimate burden of proving

entitlement to benefits," *Moats*, 42 F.4th at 563, her representative's failure to advise the ALJ of

any supposed need for another medical opinion, and additional failure to ask the ALJ to obtain or

assist with obtaining such evidence, strongly undermines Plaintiff's after-the-fact argument that

the ALJ committed error when she did not independently obtain such medical opinion evidence.

44

Second, a review of applicable regulations reveals that ALJs have broad discretion to determine whether and when to order a consultative examination.  The regulations explain that the Commissioner "*may* decide to purchase a consultative examination," 20 C.F.R. § 404.1519a(a) (emphasis added), and outline the following potential situations where such an examination may be purchased:

> (b) Situations that may require a consultative examination. We may purchase a consultative examination to try to resolve an inconsistency in the evidence, or when the evidence as a whole is insufficient to allow us to make a determination or decision on your claim. Some examples of when we might purchase a consultative examination to secure needed medical evidence, such as clinical findings, laboratory tests, a diagnosis, or prognosis, include but are not limited to:
>
> > (1) The additional evidence needed is not contained in the records of your medical sources;
> >
> > (2) The evidence that may have been available from your treating or other medical sources cannot be obtained for reasons beyond your control, such as death or noncooperation of a medical source;
> >
> > (3) Highly technical or specialized medical evidence that we need is not available from your treating or other medical sources; or
> >
> > (4) There is an indication of a change in your condition that is likely to affect your ability to work, but the current severity of your impairment is not established.

20 C.F.R. § 404.1519a(b); *see also* 20 C.F.R. § 404.1512(b)(2) (providing that the Commissioner "may order a consultative examination" when "a source is not productive, is uncooperative, or is unable to provide certain tests or procedures").

The Sixth Circuit has also confirmed that it is within an ALJ's "discretion to determine whether further evidence, such as additional testing or expert testimony, is necessary." *Foster v. Halter*, 279 F.3d 348, 355 (6th Cir. 2001); *Landsaw v. Sec'y of Health & Hum. Servs.*, 803 F.2d 211, 214 (6th Cir. 1986) ("[T]he regulations do not require an ALJ to refer a claimant to a consultative specialist, but simply grant [her] the authority to do so if the existing medical

sources do not contain sufficient evidence to make a determination."); *see also Cox v. Comm'r of Soc. Sec.*, 615 F. App'x 254, 263 (6th Cir. 2015) (finding an "ALJ's duty to develop the record" does not "require the ALJ to order a consultative examination at all") (citations omitted).

Ms. Iley acknowledges that the governing regulations provide that an ALJ "'may' but is not required to order a consultative examination" in certain enumerated situations. (ECF Doc. 9, p. 34 (citations omitted).) Plaintiff's argument is somewhat telling, in that it acknowledges a distinction between the explicit terms of the regulations—which provide clear discretion to the Commissioner and ALJs—and the cases following the *Deskin* "rule" to apply a more stringent standard that is not specifically articulated in the regulations.

As the Commissioner argues, and Plaintiff tacitly admits, *Deskin* is not binding authority and some judges in this district have criticized or declined to follow the *Deskin* standard. *See Carr v. Comm'r of Soc. Sec.*, No. 5:23-CV-00187, 2024 WL 1343473, at *5 (N.D. Ohio Mar. 30, 2024) (collecting cases). In *Winans v. Comm'r of Soc. Sec.*, for example, the court held that an "ALJ did not need to request a consultative examination to make the disability decision," despite the lack of medical opinion evidence, because the record contained "substantial evidence supporting the ALJ's finding that [the plaintiff] was not disabled." No. 5:22-cv-01793, 2023 WL 7622634, *4 (N.D. Ohio Nov. 15, 2023). The court described *Deskin* as "a non-binding district court decision that conflicts with the regulations and Sixth Circuit case law" and ultimately "places a higher burden on the ALJ than the Sixth Circuit does." *Id.* Similarly, in *Fox v. Comm'r of Soc. Sec.*, the court acknowledged the body of cases applying the "*Deskin* rule," but observed that "*Deskin* isn't controlling, and it has received mixed reviews" before concluding:

> The bottom line is that various courts apply various standards from largely unpublished district court opinions. I return to the language of the regulations and Sixth Circuit authority, which make clear that the burden to prove her case rests on the claimant, not the ALJ.

46

No. 5:23-CV-580, 2023 WL 7018362, at *8-9 (N.D. Ohio Oct. 10, 2023) (citing *Moats*, 42 F.4th at 563 and 20 C.F.R. § 404.1512(a)), *report and recommendation adopted*, 2023 WL 7222824 (N.D. Ohio Nov. 2, 2023).  The undersigned agrees with the reasoning in *Winans* and *Fox* and finds Ms. Iley's reliance on the *Deskin* standard unpersuasive.

The Sixth Circuit has explained that "[t]he responsibility for determining a claimant's residual functional capacity rests with the ALJ, not a physician." *Poe*, 342 F. App'x at 157.  In keeping with that responsibility, the Sixth Circuit does not require an ALJ to "get the opinion of another physician before setting the [RFC]." *Mokbel-Aljahmi v. Comm'r of Soc. Sec.*, 732 F. App'x 395, 401 (6th Cir. 2018).  Indeed, the court has "rejected the argument that a residual functional capacity determination cannot be supported by substantial evidence unless a physician offers an opinion consistent with that of the ALJ." *Id.* at 401-02 (citing *Shepard v. Comm'r of Soc. Sec.*, 705 F. App'x 435, 442-43 (6th Cir. 2017) *and Rudd v. Comm'r of Soc. Sec.*, 531 F. App'x 719, 728 (6th Cir. 2013)).

As to Plaintiff's argument that the ALJ was required to obtain additional opinion evidence to avoid interpreting "raw medical data" (ECF Doc. 9, p. 34; ECF Doc. 13, p 2), the Sixth Circuit has explained that an ALJ is "not required to obtain a medical expert to interpret the medical evidence related to his physical impairments." *Rudd*, 531 F. App'x at 726.  "In fact, the regulations require the ALJ to evaluate the medical evidence to determine whether a claimant is disabled." *Id.*  *See also Winans*, 2023 WL 7622634, at *5 ("Far from prohibiting ALJs from directly evaluating medical evidence, the law requires it.").

Further, Ms. Iley does not identify specific "raw data" that the ALJ was unqualified to interpret, nor does she identify specific clinical tests or findings that were missing from the record and necessary to the disability finding, as might otherwise justify ordering a consultative

47

examination. And generally, "an ALJ does not interpret 'raw medical data' where it has already been 'read and interpreted' by a medical professional." *Kleinhans v. Kijakazi*, No. 3:23-CV-00173, 2023 WL 7923901, at *8 (N.D. Ohio Sept. 28, 2023) (citing *Rudd*, 531 F. App'x at 727). For example, diagnostic imagery like an x-ray is within an ALJ's purview to consider so long as the image has been "read and interpreted by a radiologist." *Rudd*, 531 F. App'x at 726-27. Here, the medical records considered by the ALJ documented Plaintiff's diagnoses, imagery (x-rays and MRIs), EMGs and nerve conduction studies, examination findings, and treatment modalities. (*See* Tr. 20-22.) Plaintiff has not specifically identified records or clinical findings the ALJ was unqualified to consider, and the undersigned does not find the medical records in evidence to be beyond an ALJ's ability to interpret in assessing the RFC. *See generally Winans*, 2023 WL 7622634, at *5 ("[A]n ALJ does not improperly 'interpret raw medical data' simply by evaluating the medical evidence without the benefit of a medical opinion.") (citation omitted).

Instead of identifying specific "raw data" that the ALJ was allegedly unqualified to consider or specific testing or clinical findings that were needed from a consultative examiner to support a disability decision, Plaintiff argues broadly that "the ALJ was not permitted to render a commonsense judgment about physical functioning resulting from the raw medical evidence in the record" because "the medical evidence does not show relatively little physical impairment." (ECF Doc. 9, p. 34.) This proposed finding, while potentially consistent with some cases that apply the *Deskin* standard, goes beyond—and is not supported by—the explicit requirements and provisions of the governing regulations and Sixth Circuit precedent. Accordingly, the undersigned finds Plaintiff's argument that the ALJ was required to obtain an additional medical opinion simply because she did not find the state agency opinions wholly persuasive lacks merit.

48

It also warrants mention that the result would be the same in this case even if the Court applied the *Deskin* standard.  First, *Deskin* called for additional medical opinion evidence only where there was "no opinion from a medical source about functional limitations (or only an outdated nonexamining agency opinion)."  *Deskin*, 605 F. Supp. 2d at 912.  Here, state agency medical consultants, Dr. Cacchillo and Dr. Ruiz, considered the medical record and ultimately found they were bound by the prior ALJ's decision.  (Tr. 207, 217.)  Second, in *Kizys v. Comm'r of Soc. Sec.*, No. 3:10 CV 25, 2011 WL 5024866 (N.D. Ohio Oct. 21, 2011), the *Deskin* court narrowed the standard to cases where there is a "critical body of objective medical evidence" not accounted for by a medical opinion.  *Kizys*, 2011 WL 5024866, at *2.  Here, Plaintiff does not argue that the state agency medical consultants failed to account for a "critical body of objective medical evidence."  And although they adopted the prior ALJ's functional limitations, which did not account for evidence post-dating October 2021, they did so after reviewing extensive medical records from 2022 and 2023 and finding the prior RFC findings to be supported and consistent with the new medical evidence.  (Tr. 211, 217, 221, 228.)  It is thus evident that the medical opinions of record did not fail to account for a critical body of objective medical evidence.

More importantly, under the governing standards in the Sixth Circuit, the ALJ considered the evidence post-dating the medical opinions and the prior ALJ decision and accounted for it in her RFC.  The Sixth Circuit has explained that there must be "some indication that the ALJ at least considered" medical evidence that post-dates a non-examining source opinion, but did not find that such consideration must be supported by a new medical opinion.  *Blakley*, 581 F.3d at 409 (quoting *Fisk v. Astrue*, 253 F. App'x 580, 585 (6th Cir. 2007)).  District courts have accordingly concluded that "[a]n ALJ need not 'obtain[] updated opinion evidence, so long as the ALJ's ultimate decision is supported by substantial evidence." *Davidson v. Comm'r of Soc.*

49

*Sec.*, No. 3:22 CV 938, 2023 WL 5948122, at \*4 (N.D. Ohio Sept. 13, 2023) (quoting *Van Pelt v. Comm'r of Soc. Sec.*, No. 1:19 CV 2844, 2020 WL 7769729, at \*12 (N.D. Ohio Dec. 30, 2020) (citing *McGrew v. Comm'r of Soc. Sec*, 343 F. App'x 26, 32 (6th Cir. 2009))).  Here, the record shows that the ALJ appropriately considered the evidence post-dating the prior ALJ decision, in combination with other evidence of record, and adopted a physical RFC that was supported by substantial evidence.

For the reasons set forth above, the undersigned concludes that Ms. Iley has failed to show the ALJ did not comply with her duty to develop the record, was obligated to obtain more opinion evidence, or adopted a physical RFC that lacked the support of substantial evidence. Accordingly, the undersigned concludes that Ms. Iley's fourth legal issue is without merit.

### V.  Recommendation

For the foregoing reasons, the undersigned recommends that the final decision of the Commissioner be **AFFIRMED**.

July 10, 2026

/s/Amanda M. Knapp
AMANDA M. KNAPP
United States Magistrate Judge

### OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document.  Failure to file objections within the specified time may forfeit the right to appeal the District Court's order.  *See Berkshire v. Beauvais*, 928 F.3d 520, 530 (6th Cir. 2019); *see also Thomas v. Arn*, 474 U.S. 140 (1985).